**UNITED STATES of America,**
**Plaintiff,**

v.

**D'Annunzio y ELLIS DeMARCHENA,**
**Defendant.**

**Cr. No. 11658.**

United States District Court,
S. D. California.

Aug. 23, 1971.

Harry D. Steward, U. S. Atty., Catherine Chandler, Joseph A. Milchen, Ass't U. S. Attys., San Diego, Cal., for plaintiff.

Ramon Castro of Sheela, Lightner, Hughes & Castro, San Diego, Cal., for defendant.

## MEMORANDUM OPINION

TURRENTINE, District Judge.

This proceeding raises a question of first impression in this circuit: whether the court may in an appropriate case look behind an otherwise acceptable corporate surety appearance bond to ascertain the source of the collateral and determine whether there is some personal moral compulsion assuring the presence of the defendant at further proceedings. This memorandum opinion embodies the court's findings of fact and conclusions of law.

I. Background.

On July 14, 1971, the Federal Grand Jury for the Southern District of California returned an indictment in the above entitled matter, charging the defendant D'Annunzio y Ellis DeMarchena in Count One with a violation of Title 21, United States Code, Sections 952, 960 and 963, illegal importation of a controlled substance, to wit: 2,202 pounds of marijuana, and in Count Two with a violation of Title 21, United States Code, Section 841(a) (1), possession with intent to distribute a controlled substance, said marijuana. Bond was set by the court upon recommendation of the grand jury in the amount of $125,-000 cash or corporate surety.

On July 23, 1971, the defendant's bond was reduced from $125,000 to $50,000 cash or corporate surety. The Magistrate's order reducing bail provided that if cash in the sum of $50,000 were deposited in the registry of the court, a hearing might be held to determine the source of the funds, but if a corporate bond were posted no further proceedings would be held.

On August 5, 1971, after the case had been transferred to the district court, the United States Attorney filed a motion to increase the bail and to examine

the sureties on any bond proffered in the case.

On August 7, 1971, a corporate surety bond in the sum of $50,000 issued by National Automobile Casualty Insurance Co. was filed with the court. Thereafter hearings were held on August 11, 17 and 19 to inquire into the circumstances surrounding the proffering of the bond.

On July 9, 1971, the defendant Ellis DeMarchena, a citizen of the Dominican Republic, entered the United States from Mexico at the Port of Entry, San Ysidro, California. The defendant was the driver and sole occupant of a 1964 International camper truck, California license #46864H, Mexico license #HR974. Defendant gave a negative customs declaration to the immigration inspector at the primary inspection lane. A search of the truck at the secondary inspection area revealed a plywood wall at the front of the interior of the truck behind which were concealed approximately 1001 kilo packages of marijuana.

Defendant was placed under arrest and advised of his constitutional rights. Defendant thereafter stated he was the owner of the truck and had owned it for approximately 6 months. He claimed to be employed by Caliente Race Track earning $96 a week and that he would, on occasion, rent his truck out for $10 a day. Defendant had in his possession a personal check book from the Banco de Comercio, Baja, California, S.A. The check stubs indicate that checks totaling approximately $18,233 had been written from January 1971 to date.

The 1001 kilos of marijuana had an approximate cost in Mexico of $35,000 and sale value of approximately $125,000 in the Southern California market.

On July 9, 1971, the defendant appeared before the Magistrate and executed under oath CJA form 2 wherein he represented to the court that he was employed earning $150 per week, had three dependents, $100 in the bank and owned an automobile of the possible value of $1000. Thereafter the Magistrate determined the defendant was an indigent and appointed counsel.

On July 23, the defendant appeared in the Magistrate's court with retained counsel, and appointed counsel was discharged. At this hearing, bail was reduced from $125,000 to $50,000.

II. Evidence Produced at the Hearing.

On August 17, 1971, the agent for the surety, National Automobile Casualty Insurance Company, testified substantially as follows.

On August 2, 1971, he was first contacted by defendant's present attorney regarding issuing a bond. On the same day he visited the defendant in custody, and advised him that he was working on the bond.

Four days later, on August 6, 1971, a woman, accompanied by a Latin male, appeared at the business office of the bail bondsman. She identified herself as the wife of the defendant. She produced no documentary identification, nor was any request to substantiate her claim as the defendant's wife made. The woman was approximately 50 years of age, 5′ 2″ or 5′ 3″ in height, with a heavy build, of Mexican extraction, and had very little command of the English language. The male accompanying the female was never identified, either by himself or by the woman.

The woman had in her possession $55,000 in the form of United States currency. It consisted of bills in denominations of $10, $20, $50 and $100, held together by rubber bands. The money was contained in an 8″ x 8″ cardboard box, bearing the trademark "Hallmark," a gift card company. The bondsman immediately took his premium of $5000, and the remaining $50,000 was converted into a cashier's check and forwarded to the surety. At no time was there ever any indication of the source of the money.

Defendant did not take the witness stand at the hearing on August 17, 1971. Counsel for defendant advised the court that he had been in contact with the wife of the defendant; she indicated

that she was in Mexico, and her health was such that it would be impossible for her to travel into the United States to testify on this matter.

At the hearing, the defendant presented no evidence by way of oral testimony or sworn affidavits concerning his family ties, roots in the community, character, mental condition, place of residence, or record of appearance at court proceedings, if any.

The court takes judicial notice of the records of this court which reflect that between June 15, 1971, and July 19 of this year there have been six forfeitures of cash or corporate surety bonds totaling $200,000. The six cases, and the case at bar, are strikingly similar in that all involved the smuggling of a controlled substance, all arrests were made at or near the international border, and all defendants were aliens.

The hearing was continued for two days to permit the defendant to present additional information relative to his background. At the second hearing, defendant's attorney advised the court that defendant's wife was still ill, although no evidence of her incapacity was introduced. A passport photograph of the defendant's wife was submitted, which shows her to be in her mid-thirties, of very slight build. Based on this evidence, the court finds that the woman who posted the collateral with the bondsman was not the defendant's wife.

III. The Nature of the Bond is Insufficient to Guarantee Reappearance of the Defendant.

■■ Bail in the amount of $50,000 cash or corporate surety bond is reasonable as to amount in this case. However, the mere proffering of a corporation surety bond in the amount set as bail does not deprive the court of the right to inquire into areas which might bear on the question of whether the defendant will make future court appearances if released on the bond. The court has the right and the duty to satisfy itself that there is more than just a financial assurance that a bailed defendant will

appear in court when required. Thus, when a corporate surety bond is tendered for acceptance, the court has the right to ask the surety to whom they will look in the event of a forfeiture. The source of the security providing the collateral for the bond can provide valuable information regarding the motivation for a defendant to appear. If the bond were secured by the property of defendant's relatives, or close friends, the court could, logically, conclude that the possibility of financial harm to those individuals might motivate a defendant to appear. On the other hand, if the security comes from an illegitimate source, and is merely a "business" expense for a dealer in contraband, there is a a paucity of moral force compelling a defendant to reappear. Indeed, such a source would be more consistent with a possible fulfillment of a pledge to a defendant of purchased freedom if caught. When a defendant resides in Mexico, as in the case at bar, and where the source of the contraband was from a jurisdiction beyond the power of the court, the possibility becomes greater that the posting of bail is merely a means to permit the defendant to escape the jurisdiction.

■ When inquiry was made into the circumstances surrounding the tendering of the bond in this case, several things became obvious. First, using a corporate surety bond as bail was a calculated move to provide anonymity to the source of the funds. Magistrate Harris' order in reducing the bail provided alternative means for providing bail. One was the deposit of $50,000 in cash into the registry of the court. In this event, Harris indicated that he would hold a hearing to determine the source of the funds. However, Harris indicated that no such hearing would be held by him in the event that a corporate surety bond were tendered. The latter course of action was chosen, which involved an additional cost of $5,000, the bondsman's premium.

Furthermore, the surety made absolutely no effort to obtain any information about the defendant that would assist it in producing the defendant for

the court. This is not surprising, for the surety has absolutely nothing to lose. Its promise to pay the court the sum of $50,000 in the event of the defendant's failure to appear is secured in full by $50,000 cash. The surety's interest in seeing that the defendant reappears after release on bail is nonexistent.

The circumstances surrounding the bringing of the money to the bondsman are highly suspicious to say the least. First, the money was not brought by the defendant's wife, but by someone claiming to be that person. The absence of any identification of the male accompanying her is unusual. The form of the cash, wrapped in rubber bands, in the noted denominations, and carried in a greeting card box—all of these facts seem strange. Combined with the fact of the defendant's prior claim of indigency, and the anonymity sought as to the source of the money, there is a serious question in the court's mind as to the legitimacy of the source of the funds backing up the surety's bonds.

In United States v. Melville, 309 F. Supp. 824 (S.D.N.Y.1970), Judge Pollack required a bonding company to disclose the source of the collateral. He observed that:

> "A surety company is useful for purposes of bail where, as here, the caliber of the security available is not in suitable form to be used as bail. It is not however, a device to assure the anonymity of those who make up the sources of the bail; and where those sources are questioned, the Court is entitled to have a moral as well as a financial assurance therefrom of the defendant's appearance in Court when required * * *.

> As the Court has previously observed, the function of bail is not to purchase freedom for the defendant but to provide assurance of his reappearance after release on bail; a guarantee of the obligation of the defendant to appear." Id. at 826.

The Second Circuit Court of Appeals in similar circumstances has required a trial judge to exercise his discretion whether to hold a hearing to determine the adequacy of a cash bail deposited and whether it should be accompanied by sureties. United States v. Nebbia, 357 F.2d 303 (2nd Cir. 1966). There the court observed that the

> "* * * mere deposit of cash bail is not sufficient to deprive the court of the right to inquire into other factors which might bear on the question of the adequacy of the bail and * * the ability of the surety to produce the defendant." Id. at 304.

The exercise of the right to examine sureties must not be to the substantial prejudice of important rights of the defendant, such as the right to bail and the privilege against self-incrimination. In many cases those who post collateral for an accused would be reluctant to do so if there were attendant publicity. In this regard, the court has offered to conduct a closed in camera examination of defendant's wife or any other person with knowledge of the source of the collateral. The record of these proceedings would be sealed. The court at such a hearing would take every precaution to assure that any evidence offered by the defendant would not be used against him at the trial. It is believed that these precautions are sufficient to preserve the rights of the defendant while permitting the necessary information to be received by the court.

At this time the court knows nothing of the $55,000 in the Hallmark card box, except that it came from someone who cared enough to send the very best. Whether this person cares about future court appearances of defendant is doubtful.

An order rejecting the proffered bond and denying plaintiff's motion to increase bail shall be entered in accordance with this opinion.

It is ordered that defendant's motion to stay further proceedings is hereby denied. Trial is set for September 8, 1971, at 9:30 A.M.

The defendant shall have the right, on twenty-four hours notice to the United States Attorney, to calendar this matter for hearing at 8:30 A.M. to present evidence as to the source of the bail money and such other evidence as the defendant deems proper so that the court may determine conditions of release which will reasonably assure defendant's appearance at the time of trial.