UNITED STATES of America, Plaintiff,

v.

Mariano C. FEDULLO, Defendant.

Cr. No. 81–148.

United States District Court,
D. New Jersey.

Nov. 16, 1981.

William W. Robertson, U. S. Atty., D. New Jersey by Robert M. Goodman, Asst. U. S. Atty., Newark, N. J., for plaintiff.

Office of the Federal Public Defender, D. New Jersey by David A. Ruhnke and Peter V. Ryan, Deputy Public Defenders, Newark, N. J., for defendant.

## MEMORANDUM OPINION

LACEY, District Judge.

On April 17, 1981, the defendant Mariano C. Fedullo and four other individuals were arrested by FBI Agents in Newark, New Jersey, in possession of a stolen tractor trailer and its contents. On April 20, 1981, all five defendants made an initial appearance before United States Magistrate Serena Perretti at which time bail was set for all defendants. The amount of bail set for the defendant Mariano C. Fedullo, a resident of Uruguay who was illegally in the United States, was $5,000 cash or surety bond.

On April 28, 1981, a United States Grand Jury sitting in the District of New Jersey, returned a two-count indictment charging the defendant Fedullo and three of the individuals with whom he had been arrested with one count of conspiracy to possess goods stolen from an interstate shipment in violation of Title 18, United States Code, Section 371, and one count of possession of such goods in violation of Title 18, United States Code, Section 659. The fifth individual who had been arrested on April 17 was named in the indictment as an unindicted co-conspirator, and subsequently entered a guilty plea to a misdemeanor information.

On May 6, 1981, the defendant Fedullo and his co-defendants were arraigned before another judge of this court. The defendant Fedullo's bail was continued in the amount of $5,000 cash or surety bond.

Prior to that date, on May 1, 1981, an individual appeared at the Office of the United States District Court Clerk with $5,000 cash to secure the release on bail of Antonio Mega, a co-defendant of defendant Fedullo and, like him, a resident of Uruguay and illegally in the United States. At the request of the Government a hearing was held by the same judge relating to the tender of this cash bail. The result of this hearing was an order, dated May 19, 1981, rejecting the cash bail tendered on behalf of defendant Mega.

On May 20, 1981, that order was stayed by the United States Court of Appeals and the defendant Mega was released from custody. He thereafter failed to appear in connection with other proceedings in this case and a warrant was issued for his arrest. He is presently a fugitive.

On May 28, 1981, an individual appeared at the Office of the United States District Court Clerk with $5,000 cash to secure the release on bail of the defendant Fedullo. Pursuant to the Government's request, a hearing was held before me relating to the

tender of this cash bail. This hearing resulted in an order by Judge Lacey dated May 29, 1981, increasing the amount of defendant Fedullo's bail to $25,000 cash or surety bond.

On June 29, 1981, Fedullo entered a guilty plea to Count I of the Indictment pending against him and he was thereafter sentenced.

As I indicated at the time of the bail hearing I would do, I hereinafter set forth my findings of fact and conclusions of law in the matter.

1. On May 28, 1981, an individual named Manuel Garcia appeared at the Office of the Clerk of the United States District Court with $5,000 in cash in satisfaction of defendant Fedullo's bail. (Tr. 3)

2. In response to Garcia's appearance, the Government applied to this Court for a hearing pursuant to *United States v. Nebbia*, 357 F.2d 303 (2d Cir. 1966). (Tr. 5)

3. The Government's application for a hearing was granted and Garcia was thereupon brought before the Court to give testimony in this matter. (Tr. 14)

4. Garcia stated that he first met Fedullo when they were co-workers at a plastics factory in New York City from 1969 to 1970. (Tr. 15)

5. Garcia stated that Fedullo lived in Garcia's mother's house for 5 or 6 years ending in 1975 or 1976. (Tr. 18, 37, 58) The house is located at 301 West 47th Street, New York. (Tr. 46)

6. Garcia stated that prior to May 25, 1981 he had not seen Fedullo since 1976. (Tr. 15–16)

7. Garcia learned that Fedullo was in jail at the Metropolitan Correctional Center, New York, New York from mutual friends in Elizabeth, New Jersey. (Tr. 16–17)

8. Garcia cannot recall the names of these people. He met them "on the street" in Elizabeth, New Jersey. (Tr. 17–18)

9. These people did not tell Garcia about Fedullo's bail. (Tr. 24)

10. Garcia visited Fedullo on May 25, 1981 at the Metropolitan Correctional Center. (Tr. 16) Garcia initially stated that he was told by Fedullo at the Metropolitan Correctional Center that bail had been set at $5,000. (Tr. 24–31) He later stated that Fedullo did not tell him the amount of the bail until a telephone conversation on May 26. (Tr. 31)

11. Garcia told Fedullo that he would post the bail. (Tr. 31)

12. On Wednesday, May 27, 1981, Garcia took $5,000 in cash for this purpose from his wardrobe where he had hidden it.

13. Garcia gave several versions for the origin of the $5,000. He first said that it was from his job. (Tr. 20) He later said that he had withdrawn it from his savings account in 1979. (Tr. 20) He also explained that the money came from the sale of a house (Tr. 33) and that he put it in the wardrobe 4–5 years ago. (Tr. 37)

14. Garcia stated that he received instructions from Fedullo to go to a bonding agency to arrange to post bail and that he did so on May 28. That agency, however, refused to post bail for defendant Fedullo because Fedullo is an illegal alien. (Tr. 39)

15. Garcia then brought the $5,000 to the Office of the Clerk of the United States District Court. (Tr. 39) The money was wrapped in aluminum foil. (Tr. 27)

16. Garcia referred to a slip of paper in his shirt pocket when asked by the Court about his contacts with bail bondsmen. (Tr. 38)

17. Garcia denied that the writing in Spanish on the slip of paper related to the defendant Fedullo. (Tr. 41)

18. The full text of the writing on the slip of paper was translated from Spanish to English as follows:

> You know him since 1970? He live with you and your mother up until 1975 at 301 West 46, Apt. 2C. They work together in a factory, in a plastic factory. You, him and your mother. The money is yours. It's 15 days since he called you. Her sister from Uruguay in order to advise you. If he can live with you. If he has a

bail at Immigration, how much it is and where. Can you go in order to find out how much. (Tr. 42–43)

19. According to Garcia, the slip of paper had been written for Garcia by a woman named Lucia, (Tr. 41), whose last name Garcia was unable to recall, because he does not know how to write addresses in English very well. (Tr. 41)

20. I find this explanation incredible. Instead, I find that it supports the conclusion that Garcia was an emissary of an unknown person, who wrote the "script" for him.

21. Garcia was asked by the Court to write the name and address in English of the factory where he worked with Fedullo. (Tr. 45) Garcia wrote the name and address in English. (Tr. 45)

22. Garcia's Citibank passbook was examined. It indicated regular activity in his account during the period in which he had stated that he kept money in his wardrobe because he disliked banks. (Tr. 52–56)

23. Defendant Fedullo was an illegal alien having overstayed a 30-day visitor's visa. He had previously been deported in 1979 as an illegal alien. (Tr. 76–77)

24. The information that he gave to the FBI at the time of his arrest about his residence contradicted the information that he gave to Magistrate Perretti. (Tr. 65)

25. When Fedullo was illegally in the United States in 1977, he was arrested by the FBI for threatening to kill his wife. (Tr. 64)

26. A $5,000 bond was posted for Fedullo's co-defendant in this matter, Antonio Mega, in circumstances similar to those described above; (Tr. 3–4) and thereafter Mega could not be found.

## CONCLUSIONS OF LAW

On April 17, 1981 Mariano C. Fedullo, a citizen of Uruguay, who was illegally in the United States, was arrested by FBI Agents in Newark, New Jersey and charged with having violated Title 18, United States Code, Section 371, conspiracy to possess goods stolen from an interstate shipment.

On April 20, 1981, Fedullo's bail was set by U.S. Magistrate Serena Perretti in the amount of $5,000 cash or surety. On May 28, 1981, an individual named Manuel Garcia appeared at the Office of the Clerk of the United States District Court with $5,000 cash to secure the release on bail of defendant Fedullo.

Subsequently, the Government moved the Court to hold a hearing to explore the relationship between the cash proffered by Manuel Garcia and the defendant. In support of its application the Government relied on *United States v. Nebbia*, 357 F.2d 303 (2d Cir. 1966).

Based upon facts developed during this hearing the Government moved for further relief. In the alternative the Government moved pursuant to Title 18, United States Code, Sections 3143 and 3146, that (1) the Court should reject the $5,000 cash tendered by Manuel Garcia and (2) that the amount of the bail should be increased from $5,000 to an amount adequate in the Court's determination to insure the defendant's presence at trial.

Colloquially, the inquiry which the Government has requested has been called a "Nebbia hearing" after the Second Circuit Court of Appeals case of *United States v. Nebbia, supra*, 357 F.2d 303 (2nd Cir. 1966). In *Nebbia*, the defendant was charged with conspiracy to smuggle 95 kilograms of heroin into the United States. Following defendant's arrest, bail was set at $100,000 cash and that amount was tendered to the Court Clerk by way of a cashier's check. In response, the United States Attorney petitioned the Court for an order granting the alternative relief of (1) setting additional conditions to defendant's release or (2) holding a hearing to inquire into the source of the $100,000 prior to its acceptance.

The District Court denied this application by the Government and ordered the release of the defendant on $100,000 bail; the Government appealed to the Second Circuit Court of Appeals. That Court, treating the Government's application as a motion for mandamus of the District Court, held that

the District Court had discretionary authority to conduct a hearing into the proffered bail and to reject the proffered bail.

[T]he mere deposit of cash bail is not sufficient to deprive the court of the right to inquire into other factors which might bear on the question of the adequacy of the bail and stress the importance placed upon the ability of the surety to produce the defendant. *United States v. Nebbia, supra,* 357 F.2d at 304. *See also, United States v. Field,* 190 F.2d 554 (2nd Cir. 1951); *Concord Casualty & Surety Co. v. United States,* 69 F.2d 78 (2nd Cir. 1934).

The basis for this ruling was also clearly explained by the Court. *United States v. Nebbia, supra,* 357 F.2d at 304:

"The giving of security is not the full measure of the bail's obligation:" *United States v. Field,* 2nd Cir., 190 F.2d 554, 555 (1951). It "is not the sum of the bail bond that society asks for, but rather the presence of the defendant. . . ." "If the court lacks confidence in the surety's purpose or ability to secure the appearance of a bailed defendant, it may refuse its approval of a bond even though the financial standing of the bail is beyond question." (citations omitted)

In reaching its holding, *Nebbia* relied upon prior case law in the Second Circuit interpreting Rule 46, Federal Rules of Criminal Procedure. Since *Nebbia,* however, that Rule has been amended to give more express support to the *Nebbia* result. Rule 46(d) now states in pertinent part:

Every surety, except a corporate surety which is approved as provided by law, shall justify by affidavit and may be required to describe in the affidavit the property by which he proposes to justify and the encumbrances thereon, the number and amount of other bonds and undertakings for bail entered into by him and remaining undischarged and all his other liabilities.

■ In the instant case, as set forth in the findings of fact, *supra,* the source of the proffered bail funds is not an approved corporate surety. In such a case it would appear that support exists in the amended Rule 46(d) for the Court to make inquiry of the surety regarding the source of the funds which it seeks to post. That inquiry is expressly what the Government proposed herein.

■ Even where an approved corporate surety has proffered the bail funds, the Court may make inquiry into the source of the property used to secure the bond. In *United States v. Melville,* 309 F.Supp. 824 (S.D.N.Y.1970), bail for the defendant, charged in a 23-count Indictment, was set in the amount of $100,000. A corporate surety bond was proffered on behalf of the defendant in the amount of $100,000 by an approved corporate surety. In response to this proffer, the Government moved the Court to hold a hearing to inquire into the identities of the persons who had provided the collateral for the bond with the corporate surety. This application was granted by the court. *United States v. Melville, supra,* 309 F.Supp. at 829.

The Government is entitled and is granted the opportunity to ascertain the facts in respect to the sources of the bail including those to whom the corporate surety looks to secure its agreement to issue the bond.

The Court explained the reasons behind its holding as follows, *United States v. Melville, supra,* 309 F.Supp. at 828:

There is no way in which the Court can assess the impact and influence on a bail bond on the defendants' proclivity to flee without some detailed knowledge of those posting the collateral.

Similarly, in *United States v. Ellis DeMarchena,* 330 F.Supp. 1223 (S.D.Cal.1971), a District Court refused to accept a proffered surety bond without first making inquiry of the corporate surety regarding the collateral which the surety had received. In *Ellis DeMarchena,* the defendant was charged with the illegal importation of over a ton of marijuana and with possession of the marijuana with intent to distribute it. Bail, initially set in the amount of $125,000 cash or corporate surety, upon the recom-

mendation of the grand jury, was subsequently reduced by a Magistrate to $50,000 cash or corporate surety. Thereafter a motion was filed by the United States Attorney in the District Court to increase bail and to examine the sureties on any bond proffered by the defendant. Two days later a corporate surety bond in the sum of $50,000 was filed with the Court on behalf of the defendant. The Court, however, refused to accept the bond until the defendant presented evidence to the Court relating to the source and status of the funds which served as collateral for the corporate surety, *United States v. Ellis DeMarchena, supra,* 330 F.Supp. at 1226:

> The mere proffering of a corporation's surety bond in the amount set as bail does not deprive the court of the right to inquire into areas which might bear on the question of whether the defendant will make future court appearances if released on the bond. The court has the right and the duty to satisfy itself that there is more than just a financial assurance that a bailed defendant will appear in court when required. Thus, when a corporate surety bond is tendered for acceptance, the court has the right to ask the surety to whom they will look in the event of a forfeiture. The source of the security providing the collateral for the bond can provide valuable information regarding the motivation for a defendant to appear.

Moreover, an opinion in this District Court lends some support to the Court's authority to make inquiry into the source and status of the proffered bail funds. In *United States v. Caligiuri,* 35 F.Supp. 799 (D.N.J.1940), a prosecution of a bondsman for perjury in connection with false statements made under oath to a United States Commissioner who was making inquiry into the quality of surety bonds written by the defendant, the court examined, in dictum, the purpose of bail and the Court's obligation to examine the financial soundness of professional bondsmen. The Court concluded, *United States v. Caligiuri, supra,* 35 F.Supp. at 801, that:

Bail is given to secure the appearance of the accused at such time and place as the court may desire. Therefore, in determining the quality of the surety, the court must look not only to the financial sufficiency of the surety but also to the probability the surety will surrender the accused.

This court thus has the power to hold the hearing conducted in this matter, 18 United States Code, Sections 3143 and 3146(b); and, under the facts developed at the hearing, I had no course other than to reject the cash offer and to increase the bail to $25,000 cash or surety bond.