203 P.3d 1186

**STATE of Arizona, Petitioner,**

v.

**The Honorable Gary E. DONAHOE, Judge of the Superior Court of the State of Arizona, in and for the COUNTY OF MARICOPA, Respondent Judge,**

**Karen Ivette Garibaldi–Osequera, Real Party in Interest.**

**No. 1 CA–SA 09–0011.**

Court of Appeals of Arizona, Division 1, Department B.

Feb. 26, 2009.

---

Terry Goddard, Arizona Attorney General By Paula Alleman, Assistant Attorney General, Michael O'Toole, Assistant Attorney General, Phoenix, Attorneys for Petitioner.

Antonio R. Zuniga Esq. By Antonio R. Zuniga, Phoenix, Attorney for Real Party in Interest.

## OPINION

DOWNIE, Judge.

¶1 In its special action petition, the State of Arizona contends that the superior court erred in ruling that it lacked authority to inquire into the source of $100,000 in cash presented to jail personnel for bail in a criminal case. For the reasons discussed below, we hold that the court has the authority to make such an inquiry.[1]

## FACTS AND PROCEDURAL HISTORY

¶2 Real party in interest Karen Ivette Garibaldi–Osequera ("defendant") has been indicted for conspiracy to possess/transport marijuana, conducting an illegal enterprise, and money laundering. According to law enforcement officials, defendant is a money courier for a large-scale international drug-trafficking operation run by her father out of Mexico. Defendant reportedly resides in Mexico, but travels to the United States to pick up drug proceeds.[2] Based on information obtained through wiretaps, detectives believed that defendant would be transporting drug proceeds from the United States to Mexico on November 12, 2008. On that date, they stopped a vehicle registered to defendant's mother. Defendant was in the vehicle, and officers found $206,000 in U.S. currency

---

1. Defendant/real party in interest "joins the state and disagrees with the trial court's holding that it did not have authority to inquire into the source of funds to be posted for a bond." Defendant, however, disagrees with the State regarding the source of the trial court's authority. We review questions regarding the superior court's jurisdiction *de novo*. *See Samaritan Health Sys. v. Ariz. Health Care Cost Containment Sys. Admin.*, 198 Ariz. 533, 536, ¶13, 11 P.3d 1072, 1075 (App.2000) (appellate court reviews *de novo* a challenge to the superior court's jurisdiction).

2. In her response to the special action petition, defendant denies these allegations. We need not decide which version of facts is accurate to determine the legal issue presented. We note, however, that former defense counsel admitted defendant lived in Mexico, and he did not contest the facts outlined by the State at the hearing on January 6, 2009, though he did allege that the government was "trying to get the head of the organization" by "trying to have this man turn himself in in exchange for his own daughter...."

covered by a baby blanket in the passenger compartment.

¶ 3 On December 22, 2008, a state grand jury issued a warrant for defendant's arrest. A cash-only bond was set at $100,000. Defendant was arrested on December 23, 2008. A few days later, an employee from former defense counsel's office attempted to post defendant's bond with $100,000 in small denominations bundled in duct tape. Based on the amount of cash, the small denominations, the duct tape, and the nature of the charges against defendant, the jail refused to accept the money, believing that it constituted proceeds of drug trafficking or other illegal activity. On December 29, 2008, the State filed an "emergency motion" requesting a hearing to consider whether the source of the proffered funds was "legitimate." The superior court set a hearing for January 6, 2009. It further ordered that, pending that hearing, no bond would be accepted.

¶ 4 At the scheduled hearing, defense counsel challenged the superior court's authority to inquire into the source of his client's bond funds. After taking the matter under advisement, the court issued a minute entry ruling denying the State's request for a hearing. The court concluded that it lacked authority to conduct such a hearing, stating:

> [T]here is no provision in [Arizona Revised Statutes ("A.R.S.")] section 13–3967] that authorizes the court to require a defendant to disclose the source of the funds used for the bail. Nor does Rule 7, Arizona Rules of Criminal Procedure, contain any provision authorizing the court to hold a hearing requiring a defendant to prove the source of the cash posted for bail. Because of the absence of such authority in Arizona's statutes, the Rules of Criminal Procedure or Arizona case law, this Court is of the opinion that it has no authority to conduct a hearing into the source of the funds used for bail.

¶ 5 The trial court noted, however, that it could modify release conditions after giving the parties notice and an opportunity to be heard. In the minute entry, the court proposed certain modifications to defendant's release terms, including increasing the bond amount to $750,000. After a hearing on January 14, 2009, the court imposed several new release conditions, including a cash-only bond in the sum of $750,000.

## SPECIAL ACTION JURISDICTION

¶ 6 Whether to accept special action jurisdiction is highly discretionary. *See State ex rel. McDougall v. Superior Court,* 186 Ariz. 218, 219, 920 P.2d 784, 785 (App. 1996). Arizona Rule of Procedure for Special Actions 1(a) states that "the special action shall not be available where there is an equally plain, speedy, and adequate remedy by appeal."

¶ 7 The trial court's ruling is a non-appealable interlocutory order. Additionally, the special action petition raises questions of statewide importance that are likely to recur. Further, the record reflects disagreement among superior court judges regarding their authority to inquire into the source of funds used to post bail. Based on these considerations, we accept special action jurisdiction.

## DISCUSSION

¶ 8 The State's request for a so-called "Nebbia" or "source" hearing was based, in part, on the Second Circuit Court of Appeals' decision in *United States v. Nebbia,* 357 F.2d 303 (2d Cir.1966). The defendant in *Nebbia* was indicted for conspiracy to import large quantities of narcotic drugs. *Id.* at 304. Bail was set at $100,000. Nebbia repeatedly claimed an inability to post bond. Within hours of the denial of the last bail reduction application, Nebbia's attorney appeared with a cashier's check for $100,000. *Id.* The United States Attorney refused to execute a certificate allowing the Clerk to accept the funds. *Id.* Nebbia moved for an order directing his immediate release, and the government cross-moved for Nebbia's continued detention until he "could be examined for the purpose of ascertaining the source and status of the $100,000. . . ." *Id.* The district court granted Nebbia's application for release on the previously set bond and denied the government's cross-application. The government appealed.

¶ 9 The *Nebbia* court began its analysis by recognizing that the Federal Rules of Crimi-

nal Procedure allowed a person arrested in a non-capital case to be "admitted to bail," with the amount being "such as in the judgment of the . . . judge . . . will insure the presence of the defendant . . . ." *Id.* The court noted that this rule had been interpreted as requiring "more than the mere deposit of cash" and that "[i]t is not the sum of the bail bond that society asks for, but rather the presence of the defendant . . . ." *Id.*[3] In holding that the trial court had the authority to inquire into the source of bond funds, the court stated:

> [T]he mere deposit of cash bail is not sufficient to deprive the court of the right to inquire into other factors which might bear on the question of the adequacy of the bail and stress the importance placed upon the ability of the surety to produce the defendant.

*Id.* Because the district judge had concluded that he lacked discretion to hold a source hearing, the appellate court issued a writ of mandamus requiring the judge "to exercise his discretion whether to hold a hearing to determine the adequacy of the bail tendered on behalf of Nebbia, and whether it should be increased in amount or be accompanied by sureties." *Id.* at 305.

¶ 10 *Nebbia* is not binding authority in our consideration of the comparable state authorities. *See Weatherford v. State,* 206 Ariz. 529, 533, ¶ 9, 81 P.3d 320, 324 (2003) (state courts are not bound by decisions of federal circuit courts). In analyzing applicable state authorities, we begin with Article 2, Section 22, of the Arizona Constitution, which provides that all persons charged with crimes "shall be bailable by sufficient sureties," except in certain enumerated circumstances not relevant here. Subsection (B) of Section 22 articulates three purposes of bail: (1) to assure the appearance of the accused; (2) to protect against intimidation of witnesses; and (3) to protect "the safety of the victim, any other person or the community." Ariz. Const. art. 2, § 22.

¶ 11 A.R.S. § 13–3967(D) enumerates conditions that a court may impose on persons released on bail. In addition to the specifically listed terms, subsection (D)(6) authorizes courts to "[i]mpose any other conditions deemed reasonably necessary to assure appearance as required including a condition requiring that the person return to custody after specified hours." Additionally, A.R.S. § 13–3967(G) allows trial courts to modify release terms and provides:

> At any time after providing notice to the victim pursuant to § 13–4406, the judicial officer who orders the release of a person on any condition specified in this section or the court in which a prosecution is pending may amend the order to employ additional or different conditions of release, including either an increase or reduction in the amount of bail.

¶ 12 Finally, Rule 7.3 of the Arizona Rules of Criminal Procedure delineates certain mandatory release conditions and also authorizes the imposition of additional terms, stating:

> **Additional Conditions.** An order of release may include the first one or more of the following conditions reasonably necessary to secure a person's appearance:
>
> (1) Execution of an unsecured appearance bond in an amount specified by the court;
>
> (2) Placing the person in the custody of a designated person or organization agreeing to supervise him or her;
>
> (3) Restrictions on the person's travel, associations, or place of abode during the period of release;
>
> (4) *Any other condition not included in (5) or (6) which the court deems reasonably necessary;*
>
> (5) Execution of a secured appearance bond; or
>
> (6) Return to custody after specified hours.

Ariz. R.Crim. P. 7.3(b) (emphasis added).

¶ 13 The primary purpose of bail is to secure the defendant's appearance at future court proceedings. Ariz. Const. art. 2, § 22;

---

**3.** After *Nebbia* was decided, the federal bail system was modified. Federal courts now have specific authority to consider the source of property and collateral used for bail. *See* 18 U.S.C. § 3142(g)(4).

see also *Fragoso v. Fell*, 210 Ariz. 427, 434, ¶ 21, 111 P.3d 1027, 1034 (App.2005) ("the primary, if not paramount, purpose of bail under the Arizona Constitution is to guarantee a defendant's appearance in court. . . ."). The underlying assumption is that cash or property posted as security for a bond is sufficiently valuable to the defendant that he or she will appear in court as required. *See, e.g., United States v. Szott*, 768 F.2d 159, 160 (7th Cir.1985) ("The purpose of bail is not served unless losing the sum would be a deeply-felt hurt to the defendant and his family; the hurt must be so severe that defendant will return for trial rather than flee."). According to the State, when the pledged property or cash comes from an illegal activity such as drug trafficking, it does not in fact ensure the defendant's future appearance because: (1) the defendant "has no legal right to the money and losing it will be of no consequence;" and (2) its forfeiture may simply be viewed as an acceptable cost of conducting an illicit business.

¶ 14 We are persuaded that, in assessing whether a defendant poses a flight risk if released on bail, the source of his or her posted security may be relevant. *See, e.g., United States v. Dussuyer*, 526 F.Supp. 883, 884 (S.D.Fla.1981) ("Regardless of whether a bond is posted in cash or through a corporate surety, it is necessary to consider the source of the funds for the bond to accurately assess the likelihood of flight."); *United States v. Ellis DeMarchena*, 330 F.Supp. 1223, 1226 (S.D.Cal.1971) ("The source of the security providing the collateral for the bond can provide valuable information regarding the motivation for a defendant to appear. . . . [I]f the security comes from an illegitimate source, and is merely a "business" expense for a dealer in contraband, there is a a[sic] paucity of moral force compelling a defendant to reappear."); *United*

States *v. Melville*, 309 F.Supp. 824, 828 (S.D.N.Y.1970) ("There is no way in which the Court can assess the impact and influence of a bail bond on the defendant's proclivity to flee without some detailed knowledge of those posting the collateral."). We further conclude that the Arizona Constitution, A.R.S. § 13–3967, and Rule 7.3(b) are sufficiently broad to allow the superior court to inquire into the source of defendant's bond funds.[4]

¶ 15 In addition to the broad "catchall" provisions of A.R.S. § 13–3967(D)(6) and Rule 7.3(b)(4), our appellate case law has recognized the inherent power of trial courts to impose bond-related terms not specifically authorized by statute or rule. In *Fragoso*, the defense contended that the trial court lacked authority to impose a cash-only bond. 210 Ariz. at 429, ¶ 4, 111 P.3d at 1029. Another panel of this Court disagreed, holding that though neither statutes nor rules specifically authorize cash-only bonds, trial courts have the inherent authority to order them. Relying on A.R.S. § 13–3967(D) and Rule 7.3(b), the court found that "both the statute and procedural rule specifically extend to the court discretion to impose any condition not expressly listed therein if deemed 'reasonably necessary.' " *Id.* at 431, ¶ 11, 111 P.3d at 1031. Further, the court's examination of the Arizona Constitution, specifically Article 2, Section 22, led it to conclude that a defendant's right to bail based on "sufficient sureties" accords judges broad discretion in exploring whether posted funds or collateral are indeed sufficient to ensure a defendant's future appearance in court. *Id.* at 433, 111 P.3d at 1033.

¶ 16 We recognize that other state courts have reached different conclusions. *See, e.g., Cooper v. Burks*, 299 Or. 449, 702 P.2d 1107 (1985). Such decisions are of little assistance, however, given Arizona's unique blend

---

4. The State, in its reply memorandum, contends that it has broad authority to request a source hearing, even at a defendant's initial court appearance. We do not reach that argument. *See, e.g., State v. Watson*, 198 Ariz. 48, 51, ¶ 4, 6 P.3d 752, 755 (App.2000) (arguments not presented until the reply brief will not be considered); *State v. Aleman*, 210 Ariz. 232, 236, ¶ 9, 109 P.3d 571, 575 (App.2005) (same). We confine our review to the facts of this case, where the State alleged

specific articulable facts supporting a concern that the original $100,000 cash bond would not secure defendant's future appearance. *See, e.g.,* Ariz. R.Crim. P. 7.4(b) ("Any party may move for reexamination of the conditions of release whenever . . . the motion alleges the existence of material facts not previously presented to the court."). We reject defendant's argument that, to obtain a hearing, the State must first submit "prima facie proof" of its factual allegations.

of constitutional, statutory, and rule-based authorities. We are also aware that some state legislatures have seen fit to specifically authorize trial courts to inquire into the source of funds used to post bond. *See, e.g.,* Fla. Stat. § 903.046(2)(f) (2007). Although our legislature has not done so, we see nothing in existing statutes (or the constitution) restricting the inherent power of Arizona's trial courts to examine the source of bond funds when resolution of that issue is relevant to assessing a defendant's likelihood of appearing at future court proceedings.

## CONCLUSION[5]

¶ 17 Based on the foregoing, we accept special action jurisdiction and grant relief. We remand this matter to the superior court for it to determine whether, based on the information submitted by the State, examining the source of defendant's bond funds would provide information relevant to assessing the appropriateness of the current release conditions. We express no opinion as to the adequacy of the amended release

terms, but direct the trial court, on remand, to exercise its discretion in determining whether to conduct a source hearing. If such a hearing is held, the State bears the burden of establishing its factual claims. *See* Rule 7.2(d) ("The prosecutor shall bear the burden of establishing factual issues under Rule 7.2(a) . . . ."). It may proceed via circumstantial evidence and may rely on evidence not admissible under the rules of evidence. *See* Rule 7.4(c) ("Release determinations . . . may be based on evidence not admissible under the rules of evidence.").

CONCURRING: JON W. THOMPSON, Presiding Judge and DONN KESSLER, Judge.

---

**5.** Defendant has not filed a separate petition for special action. We thus do not consider her argument that we should "vacate the trial court's order raising the amount of the cash-only bond, and remand the matter for a new determination of bond by the trial court. . . ."