AMERICAN DRUGGISTS INS. CO.,
INC., and John H. Brown,
Plaintiffs-Appellants,

v.

Joseph I. BOGART, Clerk of the Court,
Southern District of Florida,
Defendant-Appellee.

No. 82–5352.

United States Court of Appeals,
Eleventh Circuit.

June 20, 1983.

Roy E. Black and Frank C. Furci, Miami,
Fla., for plaintiffs-appellants.

Clark D. Mervis and Maria P. Sperando,
Asst. U.S. Attys., Miami, Fla., for defend-
ant-appellee.

Before HILL and HATCHETT, Circuit Judges, and HAYNSWORTH,[*] Senior Circuit Judge.

JAMES C. HILL, Circuit Judge:

The United States District Court for the Southern District of Florida has an unwritten policy that allegedly disqualifies sureties from writing bonds in the district if the surety fails to pay the amount of an estreated bond within twenty days from the date of estreature. A corporate surety, which does business within the district, challenges the practice as inconsistent with the federal statutory scheme regulating corporate sureties and as a violation of the due process clause of the fifth amendment. The district court entered a summary judgment against the surety, rejecting both arguments. Upon review, we vacate the entry of summary judgment, and remand the case for further consideration.

## I.

American Druggist Insurance Company ("ADIC") is a licensed corporate surety. On November 6, 1980, John Brown, an agent of ADIC, entered into a bail bond contract for $50,000. The bond guaranteed the appearance of Ramon Raimundo Casado in a criminal proceeding before the district court. When Casado failed to appear, on February 12, 1981, the district judge estreated the bond in open court. By a letter dated February 17, 1981, the clerk of the court notified ADIC of the estreature, and advised that the surety would be disqualified from writing additional bonds if the estreated amount was not remitted to the court by March 2, 1981—twenty days from the estreature.

When twenty days elapsed, ADIC filed a motion for additional time to secure the defendant's presence. The district court granted the motion and extended the dead-

line for surrendering Casado, or paying the full amount of the bond, until March 17, 1981. ADIC, however, was unable to recapture Casado by the extended deadline. Hence, on March 17, 1981, ADIC filed a motion to stay the order of the clerk disqualifying ADIC from writing any further bonds within the district. This motion alleged that on March 16, 1981, an agent of ADIC was prohibited from writing a bond notwithstanding the court's deadline extension. The agent apparently was told that ADIC had been placed on a list of disqualified sureties and would not be permitted to write bonds unless the clerk received an order from the court. The motion to stay disqualification essentially sought declaratory relief on grounds that the court's disqualification policy violated due process requirements. Accompanying this motion also was a motion to set aside the bond forfeiture and a motion for an evidentiary hearing.

On March 20, 1981, the district court heard counsels' argument on the various motions. At that time, the district judge indicated that he had done some research into the disqualification policy, but discovered nothing more than "[t]hat is just the way we have always done it." Nevertheless, the court stated further that the surety's due process challenge was not appropriately presented in the bond forfeiture proceeding, but instead should form the basis of a separate complaint. This position was restated in an order dated March 25, 1981, in which ADIC's motions to set aside bond forfeiture and for an evidentiary hearing were denied. The order expressly refused to address the constitutionality of the court's disqualification process, suggesting that such a decision must await another day. Taking its cue, ADIC filed its present complaint against the clerk of the court for the Southern District.[1]

---

[*] Honorable Clement F. Haynsworth, Jr., U.S. Circuit Judge for the Fourth Circuit, sitting by designation.

[1] Shortly after initiating this action, ADIC paid the full amount of the bond and was removed from the court's disqualification list. Appellee

therefore asks that we dismiss the case as moot. The issues raised by ADIC, however, are too important to be ignored. Placement of the surety on the disqualification list is certainly capable of repetition, yet will continuously evade review whenever the surety is forced to succumb to the financial pressure of remaining

## II.

The major obstacle to evaluating the surety's claims is determining the practical significance of the disqualification policy. Because the procedure has not been formalized in any written rule, order, or memorandum, the origin of the court's practice is unclear. Officials in the clerk's office maintain that the practice has been in effect for more than twenty years and simply is an ongoing function of the court's administrative process.

Part of the procedure, however, has been formalized. After a determination of estreature, the clerk of the court mails a form letter to the surety. This letter notifies the surety of the forfeiture and explains that "[i]n accordance with the policy of this Court," the surety has twenty days in which to pay the full amount of the bond or else "be disqualified and precluded from writing any further bonds until said amount has been satisfied."[2] If the surety fails to comply within the requisite time, the clerk places the name of the surety on a list with similarly disqualified sureties. ADIC maintains that a surety's relegation to this list automatically disqualifies the surety from writing further bonds until payment is made. Indeed, the language of the form letter indicates that such disqualification reflects official court policy. Notwithstanding the existence of the list and the language of the form letter, appellee maintains that ultimate approval of a criminal bond remains with the appropriate district judge or magistrate. Thus, the clerk's office may not refuse to accept a judicially approved criminal bond, even if the surety's name appears on the disqualification list.

That the surety may theoretically by-pass the clerk's office and obtain judicial approval for each of the criminal bonds, however, does not negate the impact of the disqualification list. Initially, by the time judicial approval is secured, the defendant, in a hurry to raise bail funds, will likely have turned to another corporate surety not on the list. But even if the surety reaches a judicial officer in time, the list still plays a role in the approval process. Both district judges and magistrates have access to the information; either a copy of the form letter is delivered to the officer handling the forfeiture or the judge or magistrate simply telephones the clerk's office for the information. Thus, although use of the information conveyed by the disqualification list may be appropriate in the bond approval process, it would be naive to suggest that placement on the list does not significantly impede the surety's ability to do business within the district. Bearing this in mind, we turn to the specific arguments against the policy, as advanced by the surety.

### A.

■ ADIC first challenges the practice of the Southern District as inconsistent with the procedures established by federal statutes governing corporate sureties. The starting point of this analysis is rule 46(d) of the Federal Rules of Criminal Procedure which provides:

JUSTIFICATION OF SURETIES. Every surety, *except a corporate surety* which is approved as provided by law, shall justify by affidavit and may be required to describe in the affidavit the property by which he proposes to justify

on the list. Accordingly, dismissal on grounds of mootness would be inappropriate. *See Roe v. Wade,* 410 U.S. 113, 125, 93 S.Ct. 705, 712, 35 L.Ed.2d 147 (1973); *Donovan v. Sarasota Concrete Co.,* 693 F.2d 1061, 1064 n. 4 (11th Cir.1982); *Harris v. Bailey,* 675 F.2d 614, 616 (4th Cir.1982); *Resolute Insurance Co. v. Seventh Judicial District Court of Oklahoma,* 336 F.Supp. 497, 501 (W.D.Okl.), *aff'd,* 404 U.S. 997, 92 S.Ct. 558, 30 L.Ed.2d 550 (1971).

**2.** The letter to ADIC read as follows:

Gentlemen:

Please be advised that the Appearance Bond for the above-named Defendant was estreat-ed in open Court on Feb. 12, 1981 upon failure of the said Defendant to appear for TRIAL in accordance with the policy of this Court, you are hereby notified that unless the full amount of FIFTY ($50,000) THOUSAND DOLLARS is paid on or before Monday, March 2, 1981, your firm, as a Surety, will be disqualified and precluded from writing any further bonds until said amount has been satisfied.

and the encumbrances thereon, the number and amount of other bonds and undertakings for bail entered into by him and remaining undischarged and all his other liabilities. No bond shall be approved unless the surety thereon appears to be qualified.

(emphasis supplied). The advisory committee note to this rule indicates that "[c]orporate sureties are regulated by 6 U.S.C. § 6–14."[3]

Until recently, title 6 of the United States Code provided for the comprehensive regulation of corporate sureties. As of September 3, 1982, however, the title 6 provisions regulating corporate sureties have been recodified without substantive change under title 31. Act of September 13, 1982, Pub.L. No. 97–258, 96 Stat. 1085. Pursuant to the statutory regulations, the surety corporation must file a copy of its articles of incorporation and a statement of assets and liabilities with the Secretary of the Treasury. 31 U.S.C.S. § 9305(a) (Advance, November, 1982) (*formerly,* 6 U.S.C. § 8). If the Secretary is satisfied that the surety has the proper charter authority, paid-up capital of at least $250,000, and the ability to carry out its contracts, then the surety is granted written authorization to provide surety bonds under title 31. *Id.* § 9305(b).

Once authorized, the surety may write bonds pursuant to section 9304 of title 31; however, it also must file quarterly financial statements with the Secretary for the purpose of continuous evaluation. *Id.* § 9305(c). In addition, section 9305(d) provides:

The Secretary—

(1) shall revoke the authority of a surety corporation to do new business if the Secretary decides the corporation is insolvent or is in violation of this section or section 9304 or 9306 of this title;

(2) may investigate the solvency of a surety corporation at any time; and

(3) may require additional security from the person required to provide a surety bond if the Secretary decides that a surety corporation no longer is sufficient security.

*Id.* § 9305(d) (*formerly,* 6 U.S.C. § 9). Finally, section 9305(e) states:

A surety corporation providing a surety bond under section 9304 of this title may not provide any additional bond under that section if—

(1) the corporation does not pay a final judgment or order against it on the bond; and

(2) no appeal or stay of the judgment or order is pending 30 days after the judgment or order is entered.

*Id.* § 9305(e) (*formerly,* 6 U.S.C. § 11). Each of these responsibilities is detailed further in the regulations promulgated by the Secretary. *See generally* 31 C.F.R. § 223 (1982).

The extensiveness of the statutory scheme governing the continuous authorization of corporate sureties, and the explicit provisions for revocation of the right to do business, reflect Congress' intention that these functions rest with the Secretary of the Treasury. As the Second Circuit recognized in its discussion of former title 6,

Congress placed in the administrative branch of the government, the Secretary of the Treasury, the power to designate and the power to revoke the authority of sureties. 6 USCA § 6, 9. It has not been granted to the courts.... Surety companies derive their authority from charter powers and administrative officers of the federal government. Their supervision, conduct, and responsibility are left in the charge of the administrative officer.

*Concord Casualty & Surety Co. v. United States,* 69 F.2d 78, 80–81 (2d Cir.1934).

---

**3.** This reference to corporate surety regulation appears in the Advisory Committee Note entitled "Note to Subdivision (e)," because when the Federal Rules of Criminal Procedure originally were enacted, the section relating to the justification of sureties was 46(e). The rule, however, was amended in 1972. The only relevant change was that subsection (e) became subsection (d). *See generally* Advisory Committee Notes, Fed.R.Crim.P. 46 (1972 amendment).

In *Concord,* the district court attempted to exclude a surety company from writing bonds in the district because the company allegedly acquiesced in the procurement of impostor defendants who, for a fee, would appear and serve short sentences in place of real defendants. 69 F.2d at 79. Because of federal regulation of corporate sureties, however, the district court was held to be without jurisdiction to disqualify the surety. *Id.* Nevertheless, the Second Circuit indicated that district courts were not without recourse if the surety was deemed a poor moral or unsafe risk:

> If the surety company should so conduct its business as to lose the confidence of the court or a judge thereof, the judge to whom an undertaking is submitted in any case for approval could refuse to approve it. The court or the judge may direct the clerk or clerks to do likewise in such instance, under the provisions of title 6 USCA § 6. The District Court might by rule refuse to accept bonds of any named surety company. Like any other financial risk in giving an undertaking or guaranty, a moral risk as well as the material risk is involved. It is the personal responsibility—the presence of the prisoner—that a bail bond requires. When a defendant is called upon to pay his obligation to society, it is not the sum of the bail bond that society asks for, but rather the presence of the defendant for imprisonment. The court's judicial act of approval of a bond is not mandatory under section 6, but the statute calls for the exercise of a wise judicial discretion.

*Id.* at 81; *see also United States v. Nebbia,* 357 F.2d 303, 304 (2d Cir.1966).

We agree that the purpose of the bail bond is to secure the defendant's presence, *see United States v. Bass,* 573 F.2d 258, 260 (5th Cir.1978), and that the statutory framework allows for the exercise of discretion towards achievement of this goal. Section 9304(b) impliedly authorizes this discretion in its provision that "[e]ach surety bond shall be approved by the official of the Government required to approve or accept the bond." 31 U.S.C.S. § 9304(b).[4] Moreover, as recognized by the Second Circuit, the Court's bond approval process embraces an evaluation of both the moral and financial integrity of the surety. 68 F.2d at 81; *accord United States v. Melville,* 309 F.Supp. 824 (S.D.N.Y.1970). Accordingly, even if the corporate surety has been approved by the Secretary of the Treasury, the court may refuse a bond proffered by the surety if it has reason to doubt the surety's willingness to secure the defendant's presence. *See, e.g., United States v. Perrone,* 413 F.Supp. 861, 862 (S.D.Fla.1976) (corporate surety, whose agent was a friend of defendant, was prohibited from writing the bond). Moreover, the district court also may inquire into the collateral used to secure a bond written by a corporate surety. *United States v. Fedullo,* 525 F.Supp. 1210, 1214 (D.N.J.1981); *United States v. Ellis DeMarchena,* 330 F.Supp. 1223, 1226 (S.D. Cal.1971); *Melville,* 309 F.Supp. at 828. The surety's approval by the Secretary of the Treasury, therefore, does not preclude the district court from exercising its discretion to approve only those bonds which it feels confident will result in the defendant's presence at trial.

To the extent that the disqualification policy of the Southern District reflects the

---

4. Section 9304 provides in full:

(a) When a law of the United States Government requires or permits a person to give a surety bond through a surety, the person satisfies the law if the surety bond is provided for the person by a corporation—

  (1) incorporated under the laws of—

    (A) the United States; or

    (B) a State, the District of Columbia, or a territory or possession of the United States;

  (2) that may under those laws guarantee—

    (A) the fidelity of persons holding positions of trust; and

    (B) bonds and undertakings in judicial proceedings; and

  (3) complying with section 9305 and 9306 of this title.

(b) Each surety bond shall be approved by the official of the Government required to approve or accept the bond. The official may not require that the surety bond be given through a guaranty corporation or through any particular guaranty corporation.

court's discretionary decision not to deal with a recalcitrant surety, it is not inconsistent with federal regulation. However, to the extent that it purports to bar the surety from writing any bonds in the district, without complying with the statutory method of disqualification, the court arguably engages in a practice reserved to the Secretary of the Treasury. Although the court always retains the discretion to create appropriate bail and bond conditions with respect to particular criminal defendants, the regulation of corporate sureties is basically an administrative function. The key to achieving the appropriate balance is to assure that the court actually is exercising the discretion anticipated for individual bond approval.

One infirmity of the Southern District's practice is that the clerk's form letter nowhere indicates that the surety may appeal directly to the court for approval of an individual bond despite its status on the disqualification list. This suggests that the court may be overstepping its bounds. Nevertheless, because individual bond approval is theoretically obtainable, we cannot conclude that the court's actual practice is inconsistent with the discretion anticipated by the federal statutes. Rather, the infirmities of the practice are more properly attributed to its nebulous and unwritten form.

### B.

The lack of adequate notice and formalized procedures, which characterizes the court's disqualification policy, forms the basis of ADIC's due process challenge. As in any due process challenge, we first must identify a constitutionally protected interest which triggers the safeguards of the due process clause. *Board of Regents v. Roth,* 408 U.S. 564, 571, 92 S.Ct. 2701, 2706, 33 L.Ed.2d 548 (1972); *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). Once a protected interest is found to be implicated "the question remains what process is due." *Id.* at 481, 92 S.Ct. at 2600; *see also Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 428, 102 S.Ct. 1148, 1153, 71 L.Ed.2d 265 (1982).

■ In evaluating ADIC's claim of a protected interest, we are mindful that the nature of the interest must be within the contemplation of the "life, liberty, or property" language of the fifth amendment. *See Morrissey,* 408 U.S. at 481, 92 S.Ct. at 2600. However, in addition to those interests which originate in the Constitution, "the Supreme Court has also recognized that constitutionally protected liberty or property interests may have their source in positive rules of law, enacted by the state or federal government and creating a substantive entitlement to a particular government benefit." *Haitian Refugee Center v. Smith,* 676 F.2d 1023, 1037–38 (5th Cir.1982) (see cases cited in footnote 31 of the court's opinion). In *Haitian Refugee Center,* we held that federal regulations establishing asylum procedures created a constitutionally protected right to petition the federal government for political asylum. *Id.* In a similar fashion, we conclude that the federal regulation of corporate sureties creates a constitutionally protected right to present bonds to the court for judicial approval.

■ As described in the preceding section, title 31 and its accompanying regulations create an intricate scheme for the authorization and revocation of corporate surety rights. Once approved by the Secretary of the Treasury, the surety has official authorization to write bonds and to present them to the appropriate government official (in this case a judicial officer) for approval. *See* 31 U.S.C.S. § 9304(b). Although corporate sureties are the subject of continuous regulation, only two methods are prescribed to revoke their right to do business under title 31. First, if the Secretary has reason to believe that the company is not solvent or is acting in violation of sections 9304, 9305 or 9306, he may institute an inquiry and revoke the surety's authority if the company is not able to respond satisfactorily to the charges. 31 U.S.C.S. § 9305(d). Under this method of revocation, rudimentary due process has been incorporated in the Secretary's regulations. 31 C.F.R. § 233.14 (1982) provides:

Whenever it appears that a company is not complying with the requirements of 6 U.S.C. 6–13 [31 U.S.C.S. § 9304–06] and of the regulations in this part, the Secretary of the Treasury will:

(a) In all cases notify the company of the facts or conduct which indicate such failure, and provide opportunity to the company to respond, and (b) in those cases where the public interest in the constant financial stability of such a company allows, also provide opportunity to the company to demonstrate or achieve compliance with those requirements. The Secretary shall revoke a company's certificate of authority with advice to it if:

(1) The company does not respond satisfactorily to his notification of noncompliance, or (2) the company, provided an opportunity to demonstrate or achieve compliance, fails to do so.

The Secretary also has promulgated a regulation that allows the surety to apply for reinstatement after one year from the date of revocation. 31 C.F.R. § 223.21 (1982). The second way a corporate surety may lose its right to present bonds for approval is by failing to pay a final judgment or order within thirty days. 31 U.S.C.S. § 9305(e). But here again, due process rights are secured by the requirement of a final judgment,[5] or the added protection that the surety may continue to write bonds if there is an appeal or stay of the judgment or order after thirty days have elapsed. *Id.* Hence, although ADIC may not claim a right to be a corporate surety, once it has been so authorized, the statutory scheme indicates that authorization cannot be revoked without some measure of due process. *See Logan,* 455 U.S. at 432, 102 S.Ct.

at 1156; *Roth,* 408 U.S. at 576, 92 S.Ct. at 2708; *Morrissey,* 408 U.S. at 482, 92 S.Ct. at 2600; *Goldberg v. Kelly,* 397 U.S. 254, 262, 90 S.Ct. 1011, 1017, 25 L.Ed.2d 287 (1970).

The scope of the surety's protected interest arising from the federal regulatory scheme is indeed narrow. An authorized surety cannot require a court to accept its bonds; it merely has the authority to hold itself out as a corporate surety and to be eligible for employment. The nature of the right, however, is such that it may not be infringed upon without compliance with minimum due process considerations. *See Roth,* 408 U.S. at 573–74, 92 S.Ct. at 2707–2708; *cf. Hampton v. Mow Sun Wong,* 426 U.S. 88, 102, 96 S.Ct. 1895, 1905, 48 L.Ed.2d 495 (1976) ("—ineligibility for employment in a major sector of the economy—is of sufficient significance to be characterized as a deprivation of an interest in liberty."). This is because the existence of a protected entitlement turns not on the 'weight' but [on] the *nature* of the interest at stake." *Roth,* 408 U.S. at 571, 92 S.Ct. at 2706; *see also Goss v. Lopez,* 419 U.S. 565, 575–76, 95 S.Ct. 729, 736–737, 42 L.Ed.2d 725 (1975).

Nevertheless, appellee urges that the surety's interest is insufficient to prompt due process protections for essentially two reasons. First, ADIC has no right to do business in the Southern District because, like the private sector, the government is free to do business with whom it pleases. *See Perkins v. Lukens Steel Co.,* 310 U.S. 113, 127, 60 S.Ct. 869, 876, 84 L.Ed. 1108 (1940). The flaw in this argument is that it confuses the surety's desire to have a bond accepted by the court with its right to be eligible for employment within the district. The protected entitlement in this context is

---

**5.** There are two steps to a bond forfeiture proceeding. First the district court declares the forfeiture when the defendant fails to appear. According to the express language of Rule 46(e)(1), this declaration of forfeiture is mandatory upon the breach of a bond condition. Notice need not be given to the surety of the forfeiture because the surety is presumed to know the whereabouts of the defendant. *See United States v. Vera-Estrada,* 577 F.2d 598, 600 (9th Cir.1977); *United States v. Marquez,* 564 F.2d 379, 381 (10th Cir.1977). Upon forfei-

ture, the surety becomes a debtor of the government. *United States v. Plechner,* 577 F.2d 596, 598 (9th Cir.1978). If the surety does not pay, the government then moves for a judgment to enforce the forfeiture. "The entry of judgment, whereupon execution may issue, is the final act in the establishment of surety liability in a bail bond forfeiture proceeding." *United States v. Ryan,* 580 F.2d 151, 152 (5th Cir.1978). Only when the final judgment is entered is the forfeiture ripe for appellate review. *Id.*

the eligibility of employment which, unlike a bond approval, is not a "unilateral expectation." *See Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. The government has set standards for eligibility; ADIC has met those standards, and has been approved as a corporate surety. That approval of a specific bond is discretionary does not diminish ADIC's right to be eligible for employment. *See id.* at 576 n. 15, 92 S.Ct. at 2709 n. 15 (citing *Goldsmith v. Board of Tax Appeals,* 270 U.S. 117, 123, 46 S.Ct. 215, 217, 70 L.Ed. 494 (1926)); *Haitian Refugee Center,* 676 F.2d at 1038 (". . . the alien is to be allowed the opportunity to seek political asylum, even if the grant of [political asylum] is discretionary.")

Appellee's second argument is that no liberty or property interest is implicated because ADIC was not disqualified from writing bonds in any other court. In support of this position we are referred to *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1971), in which the Supreme Court held that a nontenured assistant professor had no protected interest prompting due process when his fixed one year contract was not renewed by the state university. The reasoning of the Court in *Roth,* however, commands a different result in the present case. Initially, the Court noted that the university's nonrenewal decision, at the conclusion of Roth's one year term, did not in any way damage Roth's reputation or reflect on his abilities. 408 U.S. at 573, 92 S.Ct. at 2707. Conversely, appellee acknowledges that the surety's placement on the disqualification list reflects a presumption that the surety's failure to pay promptly an estreated bond renders the surety unreliable either for moral or financial reasons. Also significant in *Roth* was the fact that the university's nonrenewal decision did not foreclose Roth from seeking further employment within the state's university system. *Id.* at 573–75, 92 S.Ct. at 2707–2708. At first blush, this appears consistent with appellee's position that ADIC could have done business in

other courts. A closer examination of *Roth,* however, discloses that the Court was concerned primarily with the difference between not being rehired for one job and the foreclosure of future employment opportunities. *Id.* This distinction is illustrated in the present case by the difference between refusing to approve a particular bond and the foreclosure of future eligibility to write bonds within the entire Southern District. The court's disqualification practice does, and indeed is designed to, foreclose a range of future opportunities. It is this foreclosure of future eligibility which prompts due process protections. *See id.* at 575, 92 S.Ct. at 2708. Finally, the Court concluded that *Roth* did not have a protected property or liberty interest because his right of re-employment was defined by the terms of his one year contract, which contained no renewal provision. *Id.* at 578, 92 S.Ct. at 2709. Roth's expectation of re-employment was therefore totally unilateral. In contrast, ADIC's right to do business as a corporate surety is defined by the statutes and regulations governing the authorization and revocation of corporate surety status. That regulatory scheme prescribes both the reasons justifying revocation and procedures designed to implement revocation and to protect the surety's interest. Upon compliance with the statutes and approval by the Secretary of the Treasury, ADIC's expectation of eligibility for employment was no longer a unilateral expectation. Accordingly, due process is a condition precedent to the infringement of that expectation.

Perhaps appellee's most persuasive argument is not that sureties lack a protected entitlement, but rather that the court's practice does not disqualify sureties from employment eligibility since a presumably disqualified surety might yet secure employment with proper judicial approval. Despite this possibility, however, it remains clear that the impact of the court's practice is to impede significantly the surety's eligibility right.[6] Because the deprivation is not

---

**6.** The significance of this impediment is illustrated by the inability of an ADIC agent to write a bond in the Southern District at the time ADIC's placement on the disqualification list was in abeyance. Although the court maintains that the clerk simply made a mistake

"*de minimus*," it thus warrants some measure of due process. *See Goss*, 419 U.S. at 576, 95 S.Ct. at 737 (". . . as long as a property deprivation is not *de minimus*, its gravity is irrelevant to the question of whether account must be taken of the Due Process Clause.").[7]

Having concluded that the surety may claim an entitlement interest, it becomes necessary to define the particular procedures constitutionally necessary to protect that interest. Unfortunately, due process is not a technical concept. Indeed, "[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Cafeteria & Restaurant Workers Local 473 v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961). Notwithstanding the inexactness of due process jurisprudence, rudimentary due process includes, at a minimum, notice reasonably calculated to apprise the surety of the charge of unreliability, and an opportunity for the surety to rebut that charge. *See Logan*, 455 U.S. at 428, 102 S.Ct. at 1153; *Mullane v. Central*

*Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). Beyond this minimum, the need for additional protections depends on a variety of factors. *See generally Mathews v. Eldridge*, 424 U.S. 319, 334–35, 96 S.Ct. 893, 902–903, 47 L.Ed.2d 18 (1976).

As it stands, the practice of the Southern District fails to comply with even these minimum standards of due process. The practice appears nowhere in the court's local rules, and the first notice the surety receives is a misleading letter from the clerk of the court. Although the surety is given twenty days in which to make payment, or to move to set aside the forfeiture, there is no guaranty that matters will be resolved or even that the surety will have an opportunity to set forth its case prior to expiration of the grace period. Thus, de facto disqualification may result without any opportunity to respond to the charges. The practice of the Southern District, therefore, is inconsistent with the due process anticipated by the constitution and cannot continue in its present amorphous state.[8]

---

because of the time extension granted ADIC to secure Casado's presence, the incident nevertheless suggests the ramification of ultimate placement on the list.

7. The severity of the deprivation, however, is relevant in determining the appropriate measure of due process. *Goss*, 419 U.S. at 576, 95 S.Ct. at 737.

8. Appellee relies in large measure on *Resolute Insurance Co. v. Seventh Judicial District Court of Oklahoma County*, 336 F.Supp. 497 (W.D. Okl.), *aff'd*, 404 U.S. 997, 92 S.Ct. 558, 30 L.Ed.2d 550 (1971), to support the constitutionality of the disqualification practice. In *Resolute*, bail bondsmen challenged the provision of the Oklahoma Bail Bond Act that allowed the State Insurance Commissioner to cancel a license issued under the Bail Bond Act for nonpayment of a forfeiture judgment that was not final. 336 F.Supp. at 449. *Resolute*, however, is not persuasive of appellee's position. Initially, it involved only the relationship between a state and its bondsmen. If anything, *Resolute* stands for the proposition that a state may enact corporate surety requirements which are more restrictive than federal requirements. The case at bar, on the other hand, requires a balancing of executive-administrative functions with judicial functions. But of greater significance in *Resolute* is the court's discussion of

the so-called "summary procedures" developed by the State of Oklahoma. For example, the procedures for license cancellation were clearly set forth in the statute:

> In the case of a surety bondsman or professional bondsman the court shall immediately direct a copy of said order and judgment of the forfeiture to the commissioner who shall give notice by mailing a copy of said order and judgment of forfeiture to the surety bondsman . . . and directing them to make a deposit to the commissioner of cash or other valuable security in the face amount of said forfeiture. Should the said deposits not be made to the commissioner within thirty days from the date of order of forfeiture, the commissioner shall: (a) in the case of a 'surety bondsman' immediately cancel the license privilege and authorization of the insurer to do business within the State of Oklahoma and cancel the license of all of said insurers, surety bondsman, agents, or runners who are licensed by this Act.

Okla.Stat. tit. 59, § 1330. This provision was found consistent with fourteenth amendment due process requirements because the bondsmen were licensed under the Bail Bond Act "with full knowledge of its provisions," 336 F.Supp. at 502, and because of the protective procedures incorporated in the statute. As the court explained:

**1238**

### III.

We are not insensitive to the problems district courts face in dealing with recalcitrant sureties. In districts burdened with numerous criminal prosecutions, orderliness is required to see that surety obligations are dutifully met. Moreover, we recognize that under clumsy procedures, those sureties who do not live up to their obligations may repeat the offense many times pending resolution of their status. Our review of the regulatory scheme, however, indicates that courts are not helpless in dealing with such sureties whether they be individual or corporate sureties. When faced with a difficult corporate surety, the district court appears to have three options; it may notify the Secretary of Treasury for the purpose of instituting an inquiry; it may enter a final judgment on decree and wait thirty days, or it may take matters into its own hands. We remand this case to the district court to determine whether the latter type of action is necessary in the Southern District. If the court determines that its current practice is necessary for the orderly processing of bonds, then the court may continue its practice or take additional action consistent with the statutory scheme. However, as a precondition to placement on the court's disqualification list, or foreclosure of future bond writing opportunities, the district court must develop procedures designed to accommodate the basic due process rights of the sureties.

REVERSED and REMANDED.

Furthermore, the Bail Bond Act does not require a notified bondsman to put up the face amount of the bail bond in cash but allows *other valuable security* to be posted. Additionally when the commissioner orders the posting with him of money or security in the face amount of a forfeited bond and the order of forfeiture is later set aside in the District Court the commissioner, pursuant to Section 1330(b), restores to the bondsman the posting. As an added safeguard any action taken by the commissioner is subject to review through the Oklahoma Administrative Procedures Act. *Id.* In stark contrast, the Southern District's practice is not even written down, and certainly does not include the procedural safeguards incorporated in the Oklahoma statute.